# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| Alan Burks, et al., | ) | |
|     *Plaintiffs-Appellees*, | ) | |
| | ) | |
| Randolph Delbert Nantz, | ) | |
|     *Plaintiff-Appellant*, | ) | |
| | ) | |
| v. | ) | Case No. 25-7118 |
| | ) | |
| Islamic Republic of Iran, et al., | ) | |
|     *Defendants-Appellees*. | ) | |
| | ) | |

## UNDERLYING DECISION FROM WHICH APPEAL ARISES

Pursuant to the Clerk's Order of August 21, 2025, Appellant through his counsel submits the underling decision from which this appeal arises as: **Exhibit A** (Order of July 23, 2025) and **Exhibit B** (Memorandum Opinion of September 30, 2022) in *Alan Burks, et al. v. Islamic Republic of Iran, et al.*, No. 16-cv-01102 (CRC) (D.D.C.).

Respectfully Submitted,

/s/ Steven R. Perles_____
Steven R. Perles
Edward MacAllister
Joshua K. Perles
PERLES LAW FIRM, PC
816 Connecticut Ave, NW
12th Floor
Washington, DC 20006
Telephone: 202-955-9055

September 22, 2025

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **ALAN BURKS**, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>**ISLAMIC REPUBLIC OF IRAN**, *et al.*,<br><br>Defendants. | Case No. 16-cv-1102 (CRC) |

**ORDER**

For the reasons stated in the Court's [65] Memorandum Opinion and in light of Plaintiff Randolph Delbert Nantz's [ECF No. 74] Status Report, it is hereby

**ORDERED** that the claims of Plaintiff Nantz are hereby dismissed for lack of jurisdiction.

This is a final appealable Order.

**SO ORDERED**.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  July 23, 2025

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ALAN BURKS, et al., | |
| Plaintiffs, | |
| v. | Case No. 16-cv-1102 (CRC) |
| ISLAMIC REPUBLIC OF IRAN, IRANIAN REVOLUTIONARY GUARD CORPS, | |
| Defendants. | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiffs are U.S. servicemen (and their families and estates) who were killed or injured in four separate terrorist attacks in Iraq from late 2006 to 2007 involving explosive devices known as explosively formed penetrators ("EFPs").  Plaintiffs also seek to represent a proposed class of all U.S. service members, military contractors, and American civilians who were injured or killed by EFP attacks in Iraq from 2005 to 2011, along with representatives of their estates and surviving family members.  Plaintiffs seek damages from Iran under the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA").  Iran has failed to appear, and default has been entered.  Plaintiffs move for default judgment as to liability and for class certification.  The Court finds that it has subject matter jurisdiction and that Plaintiffs will therefore likely prove liability.  But because the Court is not yet convinced that Plaintiffs have met the requirements for class certification under Federal Rule of Civil Procedure 23(b)(3), the Court will deny Plaintiffs' motion to certify a class without prejudice to renewal.  Because of the continued possibility of some form of class certification, the Court will also deny without prejudice the motion for default judgment on liability for the time being in order to preserve Plaintiffs' ability to serve as class representatives should the Court decide class certification is appropriate.

## I.    Background

This case arises from the U.S. military's invasion of Iraq in 2003 and subsequent military operations there from roughly 2004 to 2011.  In 2005, the military began to encounter a particular weapon known as an explosively formed penetrator or "EFP."  As explained below, Plaintiffs allege that all successful EFP attacks that occurred in Iraq between 2005 and 2011 are attributable to Iran, and thus seek money damages from Iran under the FSIA for deaths caused by the attacks.

Because Iran has failed to appear, the Court has only Plaintiffs' submissions to consider. Plaintiffs have nevertheless put forth substantial documentation supporting their claims, including the victims' medical records and autopsy reports, U.S. intelligence records generated at the time, and expert declarations from U.S. Army officers and civilian officials with firsthand experience in Iraq, including declarations from General Michael Oates (Ret.), General George Casey (Ret.), Colonel Kevin McDonnell (Ret.), FBI Special Agent Greg Carl, and Dr. Matthew Levitt.  The Court draws on these sources, as well as findings of other courts in this district that have considered similar claims, in the factual explanation that follows.  See, e.g., Karcher v. Islamic Republic of Iran, 396 F. Supp. 3d 12 (D.D.C. 2019); Lee v. Islamic Republic of Iran, 518 F. Supp. 3d 475 (D.D.C. 2021); Pennington v. Islamic Republic of Iran, No. CV19-796 (JEB), 2021 WL 2592910, at *1 (D.D.C. June 24, 2021).

Explosively formed penetrators are a particularly lethal type of improvised explosive device ("IED") that were deployed against U.S. military forces in Iraq during the United States' military operations there.  When detonated, EFPs "project a hypersonic slug of copper" that produces "characteristic hole (or holes) in armor plating that are distinct from other . . . more typical IEDs."  Pls.' Mot. on Liability at 21 (quoting PX-32 (Carl. Decl.) ¶¶ 19–23).  Because

EFPs were capable of penetrating the exterior armor of U.S. military vehicles, the "copper slug" created by the explosion would "wreak havoc on the interior of vehicles, frequently dismembering and killing [the vehicle's] occupants." Id.  As a result, EFPs were particularly dangerous to U.S. armed forces in the Middle East and were far more concerning than traditional IEDs.  PX-31 (Casey Decl.) ¶¶ 10–11, 22, 25, 32.

Given the lethality of EFP attacks, the U.S. government engaged in extensive efforts to determine their provenance.  See id. ¶¶ 8–12, 14–15, 17, 22–26; PX-32 (Carl Decl.) ¶¶ 3–11, 16, 25, 29–34.  Those efforts morphed into the Joint Improvised Explosive Device Defeat Organization ("JIEDDO" or "JIDO"), which, along with the FBI's Terrorist Explosive Device Analytical Center ("TEDAC"), worked to determine the signature elements of EFP attacks and the source of the devices.  See PX-32 (Carl Decl.) ¶¶ 4–6; PX-30 (Oates Decl.) ¶¶ 5, 16–17, 29–32.  To the extent possible, JIDO and TEDAC attempted to evaluate every IED attack that targeted U.S. forces in Iraq.  See PX-32 (Carl Decl.) ¶¶ 4, 9–11, 29–30; PX-30 (Oates Decl.) ¶¶ 5, 16, 29–32; PX-36 (McDonnell Decl.) ¶ 10.

These investigative efforts by the U.S. government produced a number of insights.  First, JIDO and TEDAC analyses revealed that, of the types of IEDs known to be used at the time, only EFPs were capable of penetrating the armor of U.S. military vehicles.  PX-31 (Casey Decl.) ¶ 22; PX-30 (Oates Decl.) ¶¶ 26, 30, 32, 44–45, 49, 57, 66.  Second, the projection of the copper slug from an EFP attack produced characteristic explosion patterns and injuries that allowed TEDAC, JIDO, and medical personnel to identify which attacks in Iraq employed EFPs rather than conventional IEDs.  See PX-32 (Carl Decl.) ¶ 23; PX-37 (Mallak Decl.) at ¶¶ 10, 18-19, 22-23, 31-32.

Third, the precision manufacturing required to produce EFPs was beyond the capability of groups operating in Iraq between 2005 and 2011. JIDO and TEDAC personnel deduced that "very precise machining"—either sophisticated equipment or a specialized press and die—was required to correctly produce a functional EFP. PX-32 (Carl Decl.) ¶¶ 25–26. FBI Special Agent Carl explained that the resources required to produce EFPs were simply unavailable to terrorist groups operating in Iraq at the time. Id. ¶ 26; see also id. ¶ 25 ("EFPs are . . . not something someone can produce in a garage." (citation omitted)).[1]

Fourth, the relevant U.S. military and civilian task forces were able to trace the machinery used to manufacture EFPs to Iran. For example, General Casey explained that, because "the EFP was a sophisticated weapon that Iraqi militias could not make and deploy without substantial assistance from Iran[,] . . . at least 75% of the copper plating used in EFP's in Iraq were machined tooled in Iran" and "U.S. intelligence had also traced back to Iran the serial numbers of the firing mechanisms of EFP's detonated in Iraq." PX-31 (Casey Decl.) ¶ 25.[2] Other courts in this district have concluded, based on presentation of similar forensic evidence, that there is a systematic link between Iran and the EFPs deployed in Iraq. See Karcher, 396 F. Supp. 3d at 28 ("The U.S. military traced much of the machinery used to manufacture the EFPs, high explosives and PIR devices deployed in Iraq to Iran and its illicit supply chain." (quoting General Oates' testimony and expert report in that case)); see also Lee, 518 F. Supp. 3d at 484

---

[1] Special Agent Carl was the Chief of TEDAC's Explosives Unit from 2003 to 2012 and was then the Director of TEDAC from 2012 to 2017. PX-32 (Carl Decl.) ¶ 1. In that capacity, Carl was involved in and supervised data collection related to EFPs and was privy to U.S. intelligence reports about the use and origins of EFPs deployed in Iraq. Id. ¶ 11.

[2] George W. Casey is a retired four-star general of the United States Army and retired as the Chief of Staff of the United States Army, the highest ranking officer in the Army, and a member of the Joint Chiefs of Staff. PX-31 (Casey Decl.) ¶ 1. During the relevant time frame General Casey was responsible for overseeing U.S. Army operations in Iraq. Id. ¶ 2–5.

("U.S. intelligence ultimately traced tens of thousands of devices that interfered with the United States' counter-EFP measures from Iran to Baghdad.").

Fifth, and finally, U.S. intelligence revealed that Iran "facilitated the smuggling of EFP components into Iraq along well-established, yet clandestine supply lines" later to be assembled in Iraq. Karcher, 396 F. Supp. 3d at 29; see PX-30 (Oates Decl.) ¶ 12. Special Agent Carl concurs that "Iran smuggled both completed EFPs and expertly made copper liners across the border to its Special Groups operating in Iraq." PX-32 (Carl Decl.) ¶ 28; see also PX-31 (Casey Decl.) ¶ 26 ("[U.S.] intelligence forces also identified the network of supply lines used by Iran to smuggle weapons and supplies from Iran into Iraq's Wasit Province south of Baghdad and Karbala, a city southwest of Baghdad.").

Based on this and similar evidence, courts in this district have concluded that "identification of the weapon as an EFP all but necessitates the inference that Iran was responsible." Karcher, 396 F. Supp. 3d at 30 (emphasis omitted); see also Pennington, 2021 WL 2592910, at *4 (noting that in Karcher, the court found the connection between Iran and EPFs was so strong "that 'absent any indication that any of these EFPs was *not* backed by Iran, the Court shall find that Iran was indeed the provider of the EFP(s) in each bellwether attack'" (quoting Karcher, 369 F. Supp. 3d at 30)). Plaintiffs' expert testimony supports this conclusion. For example, General Michael Oates, the former Director of JIDO from 2009 to 2011, concluded that "Iran was directly and indirectly responsible for all of the effective EFP attacks against U.S. forces and U.S. civilians in Iraq." PX-30 (Oates Decl.) ¶ 105;[3] see also PX-32 (Carl Decl.) ¶ 54

---

[3] General Oates served in the U.S. Army for 32 years. PX-30 (Oates Decl.) ¶ 1. His assignments included Commanding General of Operation Iraqi Freedom, and he was Director of JIEDDO from 2009 to 2011. Id. ¶ 3. He was qualified as an expert witness on the tactical and strategic threats faced by the U.S. Army in Iraq from 2003 to 2008, including the specific threat

("[I]t is my expert opinion that it is substantially more likely than not that Iran played a material role in all EFP attacks in Iraq that were effective against U.S. Forces . . . .").

Plaintiffs have also put forth substantial evidence linking Iran to the specific attacks that injured or killed the victims in this case.  Plaintiff James David Hochstetler is a retired Major in the U.S. Army Special Forces. PX-42 (J. Hochstetler Decl.) ¶ 1.  He was serving as a Captain in the U.S. Army Special Forces in Iraq when, on August 23, 2007, his convoy was attacked by multiple remote-denotated EFPs.  Id. ¶ 2. The attack killed two other soldiers who were traveling with him, and Captain Hochstetler suffered serious injuries, including a traumatic brain injury. Id.  An official investigation into the incident concluded that the attack was perpetrated by an Iran-backed Shi'a militia using EFPs that were made and supplied by Iran.  Id. ¶ 3; see also PX-10 (SIGACT Report for August 23, 2007); PX-32 (Carl Decl.) ¶ 36 (noting that "the damage caused at the entry point of the projectile into Captain Hochstetler's vehicle is consistent with the molten projectile formed by a copper EFP liner penetrating the armor").

Benjamin David Tiffner was formerly a Captain in the U.S. Army Special Forces.  PX-41 (T. Tiffner Decl.) ¶ 1.  Captain Tiffner was killed in an Iran-sponsored EFP attack on a U.S. ground convoy in Baghdad, Iraq on November 7, 2007.  Id. ¶ 2.  Several other members of the convoy were injured in the attack, but none besides Tiffner perished.  Id.  The official Army report on the attack confirmed that the damage caused was consistent with an EFP attack.  PX-32 (Carl Decl.) ¶ 46; PX-13 (Tiffner AR 15-6 Report) at 10–11; see also PX-30 (Oates Decl.) ¶ 83 (noting that Army Regulation 15-6 authorizes a commander to direct a fact-finding mission, resulting in well-documented investigative reports).  Based on review of the AR 15-6 report, as

---

faced by EFPs, by the court in Karcher v. Islamic Republic of Iran, Case No. 16-cv-232 (D.D.C.).  Id. ¶ 6.

well as video and still images of the attack, General Oates and Special Agent Carl both concluded that the attack on Captain Tiffner was caused by an EFP attack perpetrated by an Iran-supported Shi'a militia group.  PX-30 (Oates Decl.) ¶ 99; PX-32 (Carl Decl.) ¶ 49.  Plaintiff Timothy Tiffner, Captain Tiffner's father, brings suit as the personal representative of his estate.  Compl. ¶ 11.  Captain Tiffner's mother, brothers, and sister are also named Plaintiffs.  Id. ¶¶ 12–15.

Peter Burks was formerly a Second Lieutenant in the U.S. Army Special Forces.  PX-40 (A. Burks Decl.) ¶ 1.  Lieutenant Burks was killed during an Iran-sponsored EFP attack on his military convoy in Baghdad on November 14, 2007.  Id. ¶ 2.  According to the U.S. Army 15-6 incident report, upon entering the Green Zone, Lieutenant Burks' vehicle was struck by a number of EFPs that had been placed across the street from the Ministry of Public Affairs.  PX-21 (Burks AR 15-6 Report) at 9.  Further reports attributed the attack on Lieutenant Burks's convoy to a militia group backed by Iran.  PX-30 (Oates Decl.) ¶¶ 92–93.  Plaintiff Alan Burks, Lieutenant Burks's father, brings suit as the personal representative of his estate.  Compl. ¶ 5.  Lieutenant Burks's mother, brother, and sisters are also named Plaintiffs.  Id. ¶¶ 6–10.

Plaintiff Randolph Delbert Nantz is a former Sergeant First Class in the U.S. Army Special Forces.  PX-43 (Nantz Decl.) ¶ 1.  Sergeant Nantz was riding in a three-vehicle convoy in Baghdad on December 22, 2006, when a militia group ambushed his unit.  Id. ¶ 2.  When the convoy pulled over, the militia detonated an EFP that struck Sergeant Nantz's vehicle.  Id.  An ensuing firefight lasted two days, after which Sergeant Nantz was taken to a level-one trauma center.  PX-36 (McConnell Decl.) ¶ 7.  He suffered severe injuries, including nerve damage, burns, and the amputation of his left leg below the knee.  PX-43 (Nantz Decl.) ¶¶ 2–3.  The presence of copper shrapnel in Sergeant Nantz's body indicated that he had been injured by an

EFP.  See PX-37 (Mallak Decl.) ¶¶ 27–28, 30–32 ("In particular, copper slag in the bodies allows [medical professionals], to a degree of medical certainty, to opine that an EFP was at least part of the process that resulted in death or injury."); see also PX-30 (Oates Decl.) ¶ 103 ("The presence of copper shrapnel is a key indicator of an EFP weapon as the effective EFPs use a copper shape charge as the penetrator.").

Plaintiffs filed this lawsuit against the Iranian Revolutionary Guard Corps and Islamic Republic of Iran on June 13, 2016.  Compl., ECF No. 1.  Plaintiffs bring suit individually and, where appropriate, as the personal representatives of the estates of Second Lieutenant Peter Burks and Captain Benjamin Tiffner.  On October 5, 2016, the Clerk's Office mailed one copy of the summons and complaint, with a translation of each into Farsi, the official language of Iran, pursuant to 28 U.S.C. § 1608(a)(3).  ECF No. 9.  Iran refused delivery and returned the shipment.  ECF No. 11-1 (Notice of Failed Service).  On December 19, 2016, Plaintiffs requested that the Clerk of Court mail two copies of the summons, complaint, and notice of suit together with translations to the Department of State to effectuate service pursuant to 28 U.S.C. § 1608(a)(4), and the Clerk's Office did so.  ECF No. 14.  On March 24, 2017, the Department of State notified the Court that service had been completed on both defendants.  ECF No. 15.  Defendants failed to answer the complaint, and the Clerk's Office entered default.  ECF No. 17 (Clerk's Entry of Default).

Plaintiffs now move for certification of a class of all U.S. service members, military contractors, and U.S. citizen civilians who were injured or killed by EFP attacks in Iraq from 2005 to 2011, along with representatives of their estates and their surviving family members.  ECF No. 60.  Plaintiffs also move for default judgment on liability as to both the named

Plaintiffs and the proposed class members.  ECF No. 58.  Both motions are ripe for the Court's

consideration.

## II.    Legal Standards

### A.  Foreign Sovereign Immunities Act

Foreign states are generally immune from suit in federal court, subject to exceptions

codified in the Foreign Sovereign Immunities Act.  See 28 U.S.C. § 1604; see also Argentine

Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 439 (1989) ("[T]he FSIA provides the

sole basis for obtaining jurisdiction over a foreign state in federal court . . . .").  Relevant here is

the FSIA's "terrorism exception," which gives federal courts jurisdiction over suits where

plaintiffs seek money damages from a foreign state for "personal injury or death that was caused

by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of

material support or resources for such an act."  28 U.S.C. § 1605A(a)(1).

A plaintiff seeking default judgment must persuade the trial court that subject matter

jurisdiction and personal jurisdiction over the defendant are satisfied.  Thuneibat v. Syrian Arab

Republic, 167 F. Supp. 3d 22, 33 (D.D.C. 2016) (citing Khadr v. United States, 529 F.3d 1112,

1115 (D.C. Cir. 2008)).  Additionally, under the FSIA specifically, the Court cannot enter default

judgment against a foreign state "unless the claimant establishes his claim or right to relief by

evidence satisfactory to the court."  28 U.S.C. § 1608(e); see Roeder v. Islamic Republic of Iran,

333 F.3d 228, 232 (D.C. Cir. 2003).  The FSIA "leaves it to the court to determine precisely how

much and what kinds of evidence the plaintiff must provide."  Karcher, 396 F. Supp. 3d at 21

(quoting Han Kim v. Democratic People's Republic of Korea, 774 F.3d 1044, 1047 (D.C. Cir.

2014)).

The "'satisfactory to the court' standard is identical to the standard for entry of default judgments against the United States in Federal Rule of Civil Procedure 55(e)" and "[i]n evaluating the plaintiffs' proof, the court may 'accept as true the plaintiffs' uncontroverted evidence.'" Campuzano v. Islamic Republic of Iran, 281 F. Supp. 2d 258, 268 (D.D.C. 2003) (first quoting Hill v. Republic of Iraq, 328 F.3d 680, 684 (D.C. Cir. 2003); and then quoting Elahi v. Islamic Republic of Iran, 124 F. Supp. 2d 97, 100 (D.D.C. 2000)); see also Karcher, 396 F. Supp. 3d at 21 ("[U]ncontroverted factual allegations that are supported by admissible evidence are taken as true." (quoting Thuneibat, 167 F. Supp. 3d at 33)).

B.  Class Certification

Certification of a class action is governed by Federal Rule of Civil Procedure 23.  A proposed class must first satisfy the four "prerequisites" in Rule 23(a):  (1) the class members must be so numerous that joinder of all members is impractical; (2) class members' claims must present common questions of law or fact; (3) the plaintiffs' claims must be typical of the claims of the absent class members; and (4) the plaintiffs and proposed class counsel must demonstrate their ability to fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a); see In re Rail Freight Fuel Surcharge Antitrust Litig., 725 F.3d 244, 249 & n.4 (D.C. Cir. 2013).

After surmounting the requirements of Rule 23(a), class representatives must also demonstrate entitlement to class certification under one of Rule 23(b)'s three subsections. Brown v. District of Columbia, 928 F.3d 1070, 1079 (D.C. Cir. 2019).  Here, Plaintiffs seek certification under Rule 23(b)(3), which requires them to "establish that 'the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently

adjudicating the controversy.'" Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 460 (2013) (quoting Fed. R. Civ. P. 23(b)(3)).

The Court "'exercises broad discretion in deciding whether to permit a case to proceed as a class action.'" In re McCormick & Co., Pepper Prods. Mktg. & Sales Pracs. Litig., 422 F. Supp. 3d 194, 223–24 (D.D.C. 2019) (quoting Hartman v. Duffey, 19 F.3d 1459, 1471 (D.C. Cir. 1994)). "Plaintiffs must generally show that they have met the requirements of Rule 23 by a preponderance of the evidence." Hoyte v. District of Columbia, 325 F.R.D. 485, 491 (D.D.C. 2017) (citing Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 354 (2011)).

## III. Analysis

The Court begins by determining whether it has jurisdiction over Plaintiffs' claims against Iran, and then turns to class certification.

### A.  Subject Matter Jurisdiction

"The FSIA provides a basis for asserting jurisdiction over foreign nations in the United States." Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 87 (D.C. Cir. 2002). "Pursuant to the FSIA, the Court has 'original jurisdiction' over 'nonjury civil action[s]' against foreign states 'without regard to amount in controversy' if the claims seek 'relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605– 1607 of this title or under any applicable international agreement.'" Karcher, 396 F. Supp. 3d at 53 (alteration in original) (quoting 28 U.S.C. § 1330(a)). Most of these elements are easily dispensed with in this case. See id. Plaintiffs bring civil causes of action, do not demand a jury trial, and seek in personam relief for "personal injury or death," against Iran, a foreign sovereign. Accordingly, Plaintiffs have met the first three requirements.

Plaintiffs must next establish that one of the FSIA's enumerated exceptions to sovereign immunity applies to Iran.  Here, Plaintiffs rely on the terrorism exception found in 28 U.S.C. § 1605A, which provides federal courts with subject-matter jurisdiction over suits against a foreign state where (1) "money damages are sought" (2) "against a foreign state for" (3) "personal injury or death that" (4) "was caused" (5) "by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act."  28 U.S.C. § 1605A(a)(1); see Pennington, 2021 WL 2592910, at *2; see also Oveissi v. Islamic Republic of Iran, 879 F. Supp. 2d 44, 51 (D.D.C. 2012); Wultz v. Islamic Republic of Iran, 864 F. Supp. 2d 24, 32 (D.D.C. 2012).  The statute additionally requires that: (1) the defendant be a designated state sponsor of terrorism; and (2) that the "claimant or the victim" in the case was "a national of the United States," "a member of the armed forces," or "otherwise an employee of the Government of the United States," when the act happened.  28 U.S.C. § 1605A(a)(2)(A)(i)–(ii).

Most of § 1605A's requirements are also easily satisfied here.  First, Plaintiffs seek only money damages and no other form of relief.  Compl. ¶¶ 57–68, ECF No. 1.  Second, Iran was designated as a State Sponsor of Terrorism on January 19, 1984, and remains so designated today.  State Sponsors of Terrorism, Dep't of State, Bureau of Counterterrorism, https://bit.ly/2SQNecF (last visited Sept. 30, 2022); see Pennington, 2021 WL 2592910, at *3.[4]  Third, all Plaintiffs are U.S. nationals, and the victims of the relevant attacks are both U.S. nationals and members of the armed forces.  Compl. ¶¶ 4–21.  And, as described above, Plaintiffs seek money damages against Iran, a foreign state, for personal injury or death.

---

[4] Importantly, § 1605A(c) also creates vicarious liability "for the acts of [Iran's] officials, employees, or agents," in this case, the defendant Iranian Revolutionary Guard Corps.  Karcher, 396 F. Supp. 3d at 59.

That leaves the two final requirements: whether Iran's provision of material support to terrorist groups caused Plaintiffs' injuries, and whether the relevant attacks constituted "an act of torture, extrajudicial killing, aircraft sabotage [or] hostage taking." 28 U.S.C. § 1605A(a)(1).

### 1. Causation

Plaintiffs have met their burden as to causation. The FSIA requires only that Plaintiffs show "some reasonable connection between the act or omission of the defendant and the damages [that] the plaintiff has suffered." Valore v. Islamic Republic of Iran, 700 F. Supp. 2d 52, 66 (D.D.C. 2010) (quoting Brewer v. Islamic Republic of Iran, 664 F. Supp. 2d 43, 54 (D.D.C. 2009)); see also Owens v. Republic of Sudan, 864 F.3d 751, 794 (D.C. Cir. 2017) (the FSIA's causation requirement is satisfied by a showing of proximate cause), vacated on other grounds, Opati v. Republic of Sudan, 140 S. Ct. 1601 (2020). "The two similar but distinct elements to establish proximate cause are that (1) the defendant's actions were a substantial factor in the sequence of events that led to the plaintiff's injury, and (2) the plaintiff's injury was reasonably foreseeable or anticipated as a natural consequence of the defendant's conduct." Karcher, 396 F. Supp. 3d at 55 (quoting Owens, 864 F.3d at 794) (internal quotation marks and alterations omitted). Under D.C. Circuit precedent, material support or resources need not be "*directly* traceable to a particular terrorist act." Kilburn v. Socialist People's Libyan Arab Jamahiriya, 376 F.3d 1123, 1130 (D.C. Cir. 2004). Rather, it is sufficient "to show that the material support or resources went to the terrorist organization that perpetrated the act, and that the support was a 'proximate cause' of the terrorist act." Owens v. Republic of Sudan, 374 F. Supp. 2d 1, 13 (D.D.C. 2005) (citing Kilburn, 376 F.3d at 1127–30).

Plaintiffs' expert reports detail the material support that Iran provided to the various militia groups that carried out EFP attacks in Iraq between 2005 and 2011. General George W.

Casey Jr., Commander of the Multi-National Force in Iraq from 2004 to 2007, states "with great confidence that Iran provided material and/or training and logistical support for virtually all EFP devices deployed in Iraq, and that it is more likely than not that all successful EFP devices in Iraq were deployed with Iranian support." PX-31 (Casey Decl.) ¶ 11. Similarly, General Michael Oates, concludes that, "Iran was directly and indirectly responsible for all of the effective EFP attacks against U.S. forces and U.S. civilians in Iraq." PX-30 (Oates Decl.) ¶ 105; see also PX-32 (Carl Decl.) ¶ 54 ("[I]t is substantially more likely than not that Iran played a material role in all EFP attacks in Iraq that were effective against U.S. Forces.").

Iran's material support included the manufacture and provision of EFPs and their components, as well as training on how to construct and use EFPs, to Iranian-backed groups in Iraq. See PX-31 (Casey Decl.) ¶ 25 ("We believed that Iran provided the financing, explosives, other components and/or the training and know-how for virtually all EFPs used in Iraq."); PX-30 (Oates Decl.) ¶ 12 (reporting that Iran and its proxy Hezbollah played a "central role . . . in devising and supporting EFP attacks that killed and injured many hundreds of U.S. service members in Iraq"); see also Karcher, 396 F. Supp. 3d at 29. ("Iran facilitated the smuggling of [EFP] components into Iraq along well-established, yet clandestine supply lines for assembly into the finished weapons."); id. at 56 ("Beginning with the EFP strikes, the Court has concluded that Iran, through IRGC-QF and/or Hezbollah, furnished EFPs or the components thereof, facilitated training of Shi'a militia, and supported the militia's effective deployment of this weapon.").

Plaintiffs have also established that Iran materially supported each of the four specific attacks giving rise to Plaintiffs' claims. See PX-30 (Oates Decl.) ¶ 105; PX-32 (Carl Decl.) ¶ 54. First, military records about the August 23, 2007, attack on Captain Hochstetler's convoy

14

specifically report that the attack used an "Iranian-made explosively formed penetrator." PX-10 (Hochstetler SIGACT Report) at 1. The AR 15-6 report for this attack also concluded that an EFP was used to destroy Hochstetler's vehicle and caused his injuries. PX-30 (Oates Decl.) ¶ 83, 88; PX-32 (Carl Decl.) ¶ 35. Second, General Oates is "confident the attack on Captain Tiffner was the work of Iran-supported Shi'a militia." PX-30 (Oates Decl.) ¶ 99; see also PX-32 (Carl Decl.) ¶ 49 (concurring with the conclusion that Captain Tiffner's death was caused by an EFP attack conducted with Iranian material support). Third, evidence indicates the EFP attack that killed Lieutenant Burks was likely caused by a Shi'a militia group backed by Iran. PX-32 (Carl Decl.) ¶ 40. Finally, General Oates concludes that "Sergeant First Class Nantz was attacked with an EFP and that Iran provided the effective EFP to the Shi'a militia that carried out the attack." PX-30 (Oates Decl.) ¶ 104; PX-32 (Carl Decl.) ¶ 53.

The Court joins other courts in this district in finding that Iran provided material support for virtually all EFP attacks that occurred in Iraq between 2005 and 2011. The Court additionally finds that Iran's material support proximately caused the EFP attacks that injured or killed Plaintiffs.

### 2. Extrajudicial Killing

Finally, before the Court can conclude that the FSIA's terrorist exception to sovereign immunity applies to Iran, it must determine whether Plaintiffs' injuries were caused by "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act." 28 U.S.C. § 1605A(a)(1). Plaintiffs assert that each of the EFP attacks that killed or injured the named Plaintiffs, as well as all EFP attacks in Iraq between 2005 and 2011, were actual or attempted extrajudicial killings.

Section 1605A(h) specifies that the term "extrajudicial killing" has the same meaning as defined in the Torture Victim Protection Act of 1991 ("TVPA").  28 U.S.C. § 1605A(h)(7).  The TVPA, in turn, defines "extrajudicial killing" as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples" and that, "under international law," is not "lawfully carried out under the authority of a foreign nation."  28 U.S.C. § 1350 note; see also Karcher, 396 F. Supp. 3d at 55 ("Under the FSIA, the term 'extrajudicial killing' is defined consistently with Section 3 of the Torture Victim Protection Act of 1991.").  The definition encompasses three key elements: "'(1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court.'"  Karcher, 396 F. Supp. 3d at 56 (quoting Owens, 864 F.3d at 770).  Moreover, although 'terrorism' in common parlance evokes a premeditated attack on civilians, "the FSIA specifically provides a private right of action for members of the armed forces and civilians alike."  Pennington, 2021 WL 2592910, at *2.

Prior decisions of fellow courts in this district have found that EFP attacks satisfy this definition.  See Karcher, 396 F. Supp. 3d at 58; Lee, 518 F. Supp. 3d at 491–92; Pennington, 2021 WL 2592910, at *2.  The Court generally concurs.  Due to their proven lethality, an EFP attack is necessarily a deliberate effort to kill.  See Karcher, 396 F. Supp. 3d at 56 ("By virtue of this deadly weapon's design, its delivery to Shi'a militia proxies, and its effective deployment against U.S. military vehicles, the Court finds that the intended extrajudicial killings were deliberate."); see also Lee, 518 F. Supp. 3d at 492 ("Planning an EFP's location and constructing a means to trigger the device require forethought, and an EFP therefore cannot be detonated on 'a sudden impulse.'" (quoting Salzman v. Republic of Iran, Civil Action No. 17-2475 (RDM),

16

2019 WL 4673761, at *13 (D.D.C. Sept. 25, 2019))).  As noted by Plaintiffs' experts, EFPs were the only form of IED capable of penetrating the enhanced armor of U.S. military vehicles, they accounted for a disproportionate number of U.S. casualties, and they gained popularity among Iranian proxy groups because they were particularly lethal.  See PX- 30 (Oates Decl.) ¶ 26; PX-31 (Casey Decl.) ¶¶ 21–24; PX-32 (Carl Decl.) ¶¶ 19-20; PX-29 (Levitt Decl.) ¶¶ 97, 153–171; see also Karcher v. Islamic Republic of Iran (Karcher II), Civil Action No. 16-232 (CKK), 2021 WL 133507, at *65 (D.D.C. Jan. 14, 2021) ("The uniquely lethal design and destructive capacity of an EFP compels the conclusion that an EFP attack represents an attempt to kill, whether or not the attackers realize their goal.").  Moreover, there is no evidence that any EFP attack, let alone the four at issue in this case, were ever "authorized by a previous judgment pronounced by a regularly constituted court" or "lawfully carried out under the authority of a foreign nation." Karcher, 396 F. Supp. 3d at 55–56 & n.36 (finding same).

There is, however, one additional issue.  As described above, the EPF attacks that killed Lieutenant Burks and Captain Tiffner and that injured Captain Hochstetler all resulted in loss of life.  See PX-42 (J. Hochstetler Decl.) ¶ 2; PX-38 (AR 15-6 Report for August 23, 2007) at 5; PX-13 (Tiffner AR 15-6 Report) at 9; PX-21 (Burks AR 15-6 Report) at 9.  Thus far, courts in this district have uniformly concluded that § 1605A covers a claim for personal injury resulting from an attack in which *at least someone* died, even if the particular plaintiff only suffered injuries.  See Force v. Islamic Republic of Iran, No. CV 16-1468 (RDM), --- F. Supp. 3d ---, 2022 WL 2452606, at *9 (D.D.C. July 5, 2022); see also Karcher, 396 F. Supp. 3d at 58 ("[M]aterial support for an attack that extrajudicially killed someone other than the injured servicemember represented in this case is sufficient for jurisdictional purposes."); Cohen v. Islamic Republic of Iran, 238 F. Supp. 3d 71, 81 (D.D.C. 2017) (concluding that "extrajudicial

17

killing" occurred under FSIA, even though plaintiffs survived, because attack resulted in deaths).

Especially when accomplished by a particularly dangerous weapon like an EFP, "the same act of

killing one person can quite obviously injure another." Force, 2022 WL 2452606, at *9 (quoting

Owens v. Republic of Sudan, 174 F. Supp. 3d 242, 266 (D.D.C. 2016)).  The attack on Captain

Hochstetler, for example, falls into this category, as would personal injury claims brought by

servicemembers injured in the attack that killed Captain Tiffner.  PX-41 (T. Tiffner Decl.) ¶ 2.

However, the evidence currently before the Court does not indicate that any other U.S.

servicemember or civilian was killed in the attack that injured Sergeant Nantz.  See PX-36

(McDonnell Decl.) ¶¶ 5–11; PX-43 (Nantz Decl.).  Some courts in this district have held that

FSIA's terrorism exception encompasses a claim involving an attack that may be a deliberate

*attempt* to kill but does not actually result in death.  E.g., Gill v. Islamic Republic of Iran, 249 F.

Supp. 3d 88, 99 (D.D.C. 2017) ("This Court is persuaded . . . that the Torture Victim Protection

Act's definition of extrajudicial killing allows plaintiffs to assert liability for a defendant's

attempted extrajudicial killing, even if no one died as a result of that attempt."); Karcher, 396 F.

Supp. 3d at 57 ("[T]he Court concludes that material support or resources to facilitate EFP

attacks qualify as material support for attempted extrajudicial killings."). These decisions have

reasoned that, because courts should "construe[] the FSIA's ambiguities broadly," an injury

"resulting from 'deliberated' attempts to kill fall within the scope of Section 1605A(a)(1)."

Karcher, 396 F. Supp. 3d at 58.

By contrast, one court in this district recently held that the FSIA's terrorism exception

does not abrogate sovereign immunity for attempted extrajudicial killings when no one is, in fact,

killed in the attack.  As noted above, one key element of an "extrajudicial killing" under the

TVPA is "a killing"—generally understood to mean an act that resulted in death.  See Force,

2022 WL 2452606, at *5 ("The ordinary understanding of the word 'killing,' of course, is that someone died."). Because a key element is "a killing," the Force court concluded that § 1605A and the TVPA's definition of an "extrajudicial killing" does not encompass an attempted, but unsuccessful, attack. See Force, 2022 WL 2452606, at *4; id. at *5 ("The TVPA, in other words, contemplates that the direct victim in an extrajudicial killing will not survive."). The Force court therefore concluded that the statute "imposes liability for a 'deliberated killing' but not an 'attempted deliberated killing.'" Id. at *8 (quoting Appel v. Hayut, No. 20-cv-6265, 2021 WL 2689059, at *9 (S.D.N.Y. June 30, 2021)).

The Court finds Force's reasoning persuasive. The TVPA's definition of extrajudicial killing "contain[s] three elements," the first of which is "a killing." Id. at *4 (quoting Owens, 864 F.3d at 770). And although the general purpose of the terrorism exception is to "prevent state sponsors of terrorism . . . from escaping liability for their sins," Gill, 249 F. Supp. 3d at 99, the Court agrees that "when Congress intends to include attempts in a statutory proscription, it [usually] does so expressly," Force, 2022 WL 2452606, at *5. In other words, Congress chose to abrogate sovereign immunity for an "act of . . . extrajudicial killing," but did not expressly abrogate sovereign immunity for an attempted extrajudicial killing. Whether that is the appropriate line to draw to serve the statute's remedial purpose is a decision for Congress, not this Court. See Force, 2022 WL 2452606, at *6 ("There may—or may not—be good reasons for including some attempted terrorist acts and not others. But that choice is one for Congress, and not the courts, to make."); id. at *9 ("Although the Court can, in theory, see why Congress might choose to include attempted extrajudicial killings within the ambit of the FSIA's terrorism exception, the Court can also see why Congress might have limited the reach of the exception to the most heinous and destructive acts."); Owens, 174 F. Supp. 3d at 266 ("[T]here is nothing

19

absurd about eliminating immunity only for those acts that actually cause death, for those are likely to be the most heinous.").

The clarity of the TVPA's definition of "extrajudicial killing" undercuts the contention that other language in § 1605A broadens that definition to include attempted as well as actual extrajudicial killings.  Other courts in this district, for example, have concluded that the statute's use of the phrase "*act of* . . . extrajudicial killing" connotes not only "a thing done" or a specific "deed" but also "[t]he process of doing" something and that, therefore, § 1605A(a)(1) plausibly encompasses "the process of committing an extrajudicial killing," which may or may not result in a death.  Roberts v. Islamic Republic of Iran, 581 F. Supp. 3d 152, 169–70 (D.D.C. 2022). Another court has also found significant that § 1605A(a)(1) waives sovereign immunity for injuries caused by the provision of material support or resources "*for* such an act" identified earlier—including an extrajudicial killing—reasoning that material support "with the object or purpose of" accomplishing an extrajudicial killing constitutes support "for such an act" under the statute, "even if a resulting attack is not deadly."  Borochov v. Islamic Republic of Iran, No. 1:19-cv-02855 (TNM), --- F. Supp. 3d ---, 2022 WL 656168, at *8 (D.D.C. March 4, 2022) (emphasis added).

These interpretations stretch the text of the statute too thin.  The primary, and most intuitive, understanding of the word "act" is "[s]omething done or performed" or "a deed."  Act, Black's Law Dictionary (11th ed. 2019); see also Act, Webster's Third New International Dictionary (unabr. 2002) ("a thing done or being done").  If, when writing the FSIA's terrorism exception, Congress wished to alter the understanding that an "extrajudicial killing," as defined in the TVPA, required a death, adding the words "an act of" would be a very oblique way to do so.  Moreover, both the phrase "act of . . . extrajudicial killing" and the phrase "material support

20

or resources for such an act" ultimately refer back to the same, defined act: an extrajudicial killing. Put another way, "the material-support prong applies only if the foreign state provides 'material support or resources for *such an act*'—that is, as relevant here, for 'an act of . . . extrajudicial killing." Force, 2022 WL 2452606, at *7. And without a killing, "the Court cannot conclude that the asserted injury was caused by 'an act of . . . extrajudicial killing' or that the material support was provided for 'such an act.'" Id.

Accordingly, the Court finds that the EFP attacks that killed Lieutenant Burks and Captain Tiffner and injured Captain Hochstetler are "extrajudicial killings" within the meaning of the statute. However, absent further factual development, the EFP attack that injured Sergeant Nantz was not an "extrajudicial killing" under § 1605A.

The Court is mindful that its interpretation of § 1605A may leave some who have suffered horrific injuries, including Sergeant Nance, without a judicial remedy against Iran's deliberate efforts to kill U.S. citizens and contractors. By the same token, expanding § 1605A's coverage to include attempted extrajudicial killings could permit claims based on conduct far less heinous than Congress intended to punish by enacting § 1605A. Deciding where to cut off liability for Iran's actions (and those of other state sponsors of terrorism) involves difficult policy choices, particularly given the limited funds available to satisfy judgments. But as the Force court observed, those choices are for Congress to make, not this Court.

    B. Personal Jurisdiction and Service of Process

In addition to subject matter jurisdiction, Plaintiffs must also establish that this Court has personal jurisdiction over the defendants. Under the FSIA, a court has personal jurisdiction over a foreign sovereign where the court has subject matter jurisdiction and "service has been made under" 28 U.S.C. § 1608. See 28 U.S.C. § 1330(b); Lee, 518 F. Supp. 3d at 494 ("In other

words, under the FSIA, subject matter jurisdiction plus service of process equals [personal]

jurisdiction." (quoting GSS Grp. Ltd. v. Nat'l Port Auth., 680 F.3d 805, 811 (D.C. Cir. 2012))).

Section 1608(a) sets out four methods by which service may be made, in ranked order.

First, a plaintiff may effect service by delivering "a copy of the summons and complaint in

accordance with any special arrangement for service between the plaintiff and the foreign state or

political subdivision." 28 U.S.C. § 1608(a)(1). If service cannot be made under such an

arrangement, then the plaintiff may effect service "by delivery of a copy of the summons and

complaint in accordance with an applicable international convention on service of judicial

documents." Id. § 1608(a)(2). If no such agreements exist, the plaintiff must attempt service

through a third method, which involves sending the requisite documents "by any form of mail

requiring a signed receipt . . . to the head of the ministry of foreign affairs of the foreign state

concerned." Id. § 1608(a)(3). And should that fail, after thirty days a plaintiff may resort to a

fourth method: he must provide the Clerk's Office with two copies of the summons and

complaint, and a notice of the suit, along with a translation of each into the official language of

the foreign state, which the clerk transmits to the Secretary of State. Id. § 1608(a)(4). The

Secretary of State will then "transmit one copy of the papers through diplomatic channels to the

foreign state and shall send to the clerk of the court a certified copy of the diplomatic note

indicating when the papers were transmitted." Id.; see Pennington, 2021 WL 2592910, at *3.

Plaintiffs have successfully effected service on Iran. The United States and Iran do not

have a "special arrangement" for service, nor is Iran a "party to an international convention on

service of judicial documents." 28 U.S.C. §§ 1608(a)(1)–(2). Moving to option three, Plaintiffs

attempted but were unable to effect service under § 1608(a)(3). See ECF No. 11 (December 16,

2016 Notice of Failed Service). On December 16, 2016, Plaintiffs requested that the Clerk's

22

Office mail two copies of the summons, complaint, and notice of suit together with a translation of each in the official language of Iran to the Department of State to effectuate service pursuant to 28 U.S.C. § 1608(a)(4).  ECF No. 13; see also ECF No. 14 (clerk's certificate of mailing those documents to State Department).  On March 24, 2017, the Department of State notified the court that service was completed on Defendants Iranian Revolutionary Guard Corps and Islamic Republic of Iran.  ECF No. 15.  Plaintiffs have therefore properly effected service on Iran under 28 U.S.C. § 1608(a)(4).

*   *   *

For the foregoing reasons, the Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1605A(a)(1).  Additionally, because Plaintiffs have properly effected service, the Court likewise has personal jurisdiction over Iran.  See Lee, 518 F. Supp. 3d at 494.  Mindful that it lacks the authority "to raise the FSIA terrorism exception's statute of limitations on behalf of an entirely absent defendant," Maalouf v. Islamic Republic of Iran, 923 F.3d 1095, 1112 (D.C. Cir. 2019), the Court sees no other jurisdictional hurdles and proceeds onward to Plaintiffs' motion to certify a class.

C.  Class Certification Under Rule 23(b)

Plaintiffs seek the certification of a class consisting of all U.S. service members, military contractors, and American civilians injured or killed by terrorist attacks involving EFPs during the U.S. military's operations in Iraq between 2005 and 2011, the personal representatives of individuals killed in EFP attacks, and the immediate family members of the foregoing individuals, with the exception of people who have retained other counsel to pursue those claims. Mot. for Class Certification at 1, ECF No. 60.  Because the Court found, supra Part III.A.2, that it has jurisdiction only over claims of personal injury or death that resulted from an EFP attack

that resulted in at least one death, the Court will limit the definition of EFP attacks as it relates to any class in the same manner.

As outlined above, to obtain class certification, Plaintiffs must first satisfy the four fundamental requirements of Rule 23(a)—numerosity, commonality, typicality and adequacy. Plaintiffs must then demonstrate entitlement to class certification under one of Rule 23(b)'s subsections. Here, Plaintiffs seek certification under Rule 23(b)(3), which requires that common issues predominate with respect to all class members' claims and that a class action constitute the superior means for resolving those causes of action. If the Court declines to certify the class under Rule 23(b)(3), in the alternative Plaintiffs seek certification with respect to liability only under Rule 23(c)(4), which authorizes "class-wide adjudication of one or more issues that are common to all class members even if other issues will have to be litigated separately." McLaughlin on Class Actions § 4:43 (18th ed.).

> 1. *Rule 23(a)*

>> a. Numerosity

A class satisfies Rule 23(a)(1)'s "numerosity" requirement where "the class is so numerous that joinder of all members is impractical." Fed. R. Civ. P. 23(a)(1). "As a rule of thumb, a class of over 40 members satisfies the numerosity requirement." McCormick, 422 F. Supp. 3d at 235. Courts may also "take the geographical location of the proposed class members into consideration" when determining numerosity. In re Vitamins Antitrust Litig., 209 F.R.D. 251, 259 (D.D.C. 2002).

Here, Plaintiffs have provided government investigative reports which indicate that at least 1,057 military personnel, military contractors, and other U.S. citizens were killed or injured in EFP attacks during the class period. PX-44 (CENTCOM EFP Stats) at 6; PX-36 (McDonnell

Decl.) ¶¶ 16–19.  Specifically, Plaintiffs have obtained official U.S. Central Command

("CENTCOM") data demonstrating that, between July 2005 and November 2011, there were

1,534 EFP detonations in Iraq, which killed 196 individuals and injured 861.  PX-44 at 4–6.  The

identities of those individuals injured or killed in EFP detonations can be ascertained through

government databases.  See PX-37 (Mallak Decl.) ¶¶ 19–21.  Immediate family members of

those killed may also have claims under § 1605A, increasing the class number further.  Even

assuming some portion of those individuals identified have already retained separate counsel,

and some number of prospective plaintiffs were injured in attacks that will not qualify because

there were no deaths, the Court is satisfied that Plaintiffs' proposed class satisfies the numerosity

requirement.  Hoyte, 325 F.R.D. at 490 ("The numerosity requirement can be satisfied so long as

there is a reasonable basis for the estimate provided." (emphasis omitted) (quoting Feinman v.

FBI, 269 F.R.D. 44, 50 (D.D.C. 2015))).

b.  Commonality

"To establish commonality under Rule 23(a)(2), a plaintiff must identify at least one

question common to all members of the class."  Garcia v. Johanns, 444 F.3d 625, 631 (D.C. Cir.

2006).  That is, a shared issue of fact or law satisfies the commonality requirement if it is

"capable of classwide resolution—[i.e.,] that determination of its truth or falsity will resolve an

issue that is central to the validity of each one of the claims in one stroke."  Cobell v. Salazar,

679 F.3d 909, 922 (D.C. Cir. 2012) (quoting Wal-Mart, 564 U.S. at 350).  Under this standard,

"factual variations among the class members will not defeat the commonality requirement, so

long as a single aspect or feature of the claim is common to all proposed class members."

Stephens v. Farmers Rest. Grp., 329 F.R.D. 476, 483 (D.D.C. 2019) (quoting Bynum v. District

of Columbia, 214 F.R.D. 27, 33 (D.D.C. 2003)).

Here, all proposed class members are pursuing a single legal claim under 28 U.S.C. § 1605A, the FSIA's terrorism exception. Given the "almost total 'overlap between the elements of § 1605A(c)'s cause of action and the terrorism exception to foreign sovereign immunity,'" a plaintiff who "offers proof sufficient to establish a waiver of sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of law." Lee, 518 F. Supp. 3d at 495–96 (quoting Salzman, 2019 WL 4673761, at *15). To establish jurisdiction, as outlined above, the named Plaintiffs had to prove a number of facts common to all prospective class members' claims. These include that Iran materially supported the groups that carried out the relevant EFP attacks, and that the U.S government had designated Iran as a state sponsor of terrorism at the time. See 28 U.S.C. § 1605A(a)(2)(A)(i)(I). These common questions would also determine Iran's liability for any claims arising from EFP attacks.

Moreover, Plaintiffs expect to rely on fairly uniform proof to demonstrate Iran's responsibility for all qualifying EFP attacks in Iraq during the proposed class period. Again, as explained above, the FSIA does not require a defendant's material support to be directly traced to each individual terrorist act. Kilburn, 376 F.3d at 1130. Rather, it is sufficient "to show that the material support or resources went to the terrorist organization that perpetrated the act, and that the support was a 'proximate cause' of the terrorist act." Owens v. Republic of Sudan, 374 F. Supp. 2d 1, 13 (D.D.C. 2005) (citing Kilburn, 376 F.3d at 1127–30). Accordingly, Iran's liability for EFP attacks that killed or injured American military personnel can be established through evidence common to all class members. The fact that class members' damages would require individual proof does not prevent a finding that a class satisfies the commonality requirement. See Alliota v. Gruenberg, 237 F.R.D. 4, 11 (D.D.C. 2006). Plaintiffs' proposed class therefore satisfies the commonality requirement.

c. <u>Typicality</u>

Under Rule 23(a)(3), class representatives' claims must be "typical" of the claims of the absent class members. A class representative's "claim is typical if it arises from the same event or practice or course of conduct that gives rise to a claim of another class member where his or her claims are based on the same legal theory." <u>Nat'l Veterans Legal Servs. Program v. United States</u>, 235 F. Supp. 3d 32, 40 (D.D.C. 2017) (quoting <u>Bynum</u>, 214 F.R.D. at 34). The facts and claims of each class member "need not be identical" to satisfy the typicality requirement. <u>Howard v. Liquidity Servs. Inc.</u>, 322 F.R.D 103, 118 (D.D.C. 2017) (quoting <u>In re APA Assessment Fee Litig.</u>, 311 F.R.D. 8, 15 (D.D.C. 2015)). Rather, "the typicality requirement calls for 'sufficient factual and legal similarity between the class representative's claims and those of the class to ensure that the representative's interests are in fact aligned with those of the absent class members.'" <u>Id.</u> at 119 (quoting <u>In re Navy Chaplaincy</u>, 306 F.R.D. 33, 53 (D.D.C. 2014)); <u>see also</u> <u>Encinas</u>, 265 F.R.D. at 9 ("A plaintiff's claims can be typical of those of the class even if there is some factual variation between them.").

Plaintiffs' claims satisfy the typicality requirement. All of the prospective class members, including the named Plaintiffs, assert the same single claim under 28 U.S.C. § 1605A(c) based upon Iran's targeting of American service members with EFP attacks. The same fact and expert testimony that links Iran to the EFP attacks that injured named Plaintiffs would form the basis of the claims of absent class members as well. Furthermore, Plaintiffs would establish that EFPs (and not another type of explosive device) caused their injuries by introducing sources of fact and expert evidence of the same type as the evidence that would establish Iran's culpability for the EFP attacks that injured class members.

27

In light of the above, the Court is convinced that Plaintiffs' claims satisfy the typicality requirement, as the claims of Plaintiffs and the proposed class all arise from Iran's course of conduct providing material, training, and logistical support for EFP attacks in Iraq.

### d.   Adequacy

Finally, Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequacy has two components: "the class representative (i) 'must not have antagonistic or conflicting interests with the unnamed members of the class' and (ii) 'must appear able to vigorously prosecute the interests of the class through qualified counsel.'" J.D. v. Azar, 925 F.3d 1291, 1312 (D.C. Cir. 2019) (quoting Twelve John Does v. District of Columbia, 117 F.3d 571, 575 (D.C. Cir. 1997)).

First, as described above, the named Plaintiffs' interests are coextensive with those of the absent class members, as they assert the same single claim under § 1605A(c) for the same conduct by Iran. Second, Plaintiffs have demonstrated their willingness and ability to pursue the interests of all class members vigorously through competent counsel. Captain James Hochstetler, for example, was injured by EFP attacks in Iraq and survived and thus has similar interests with other, similarly situated plaintiffs. See PX-42 (Hochstetler Decl.) ¶ 2; see also id. ¶ 5 (stating that he volunteered as a class representative because, Iran's role in EFP attacks "has not been broadly publicized" and he believes the lawsuit is necessary "to make sure all service members who were killed or injured . . . can assert their claims").

Additionally, the other named Plaintiffs—who are the personal representatives of the estates of Peter Burks and Benjamin Tiffner—share the interests of the absent class members who would bring suit in a similar capacity, i.e., as the personal representatives of the estates of their deceased family members. See PX-40 (declaration of Alan Burks, Lieutenant Burks' father

and personal representative of his estate); PX-41 (T. Tiffner Decl.) ¶¶ 3–4 (noting that, until

shortly before filing the complaint, the family of Captain Tiffner was unaware that Iran was

responsible for the EFP attack or that it was possible to hold Iran accountable through a lawsuit).

As such, the proposed class representatives' interests are coextensive with the interests of the

class.

Additionally, the Court is persuaded that proposed class counsel possesses the motivation

and resources necessary to adequately represent any class.  The Perles Law Firm, P.C. and

Fleischman Bonner & Rocco LLP have experience litigating cases under the FSIA and other

terrorism-related statutes as well as class actions.  See PX-46 (Perles Decl.) ¶¶ 2–12; PX-50

(Bonner Decl.) ¶¶ 3–6; see also, e.g., Howard, 322 F.R.D. at 135 ("Particularly in complex cases,

'the qualifications of class counsel are generally more important in determining adequacy than

those of the class representatives.'" (Harris v. Koenig, 271 F.R.D. 103, 135 (D.D.C. 2017))).

e.  Ascertainability

Rule 23 does not expressly require that a class be "ascertainable," and the D.C. Circuit

"has not addressed whether Rule 23 contains an ascertainability requirement for class

certification."  Azar, 925 F.3d at 1320; see also Hoyte, 325 F.R.D. at 489 (noting that some

courts have added an "'implied' fifth requirement . . . that the general outlines of the membership

of the class are determinable at the outset of the litigation" (quoting Thorpe v. District of

Columbia, 303 F.R.D. 120, 139 (D.D.C. 2014))).

Although most federal circuits have recognized an implied ascertainability requirement,

courts nevertheless "'diverge' as to the meaning of ascertainability."  McCormick, 422 F. Supp.

3d at 241 (quoting Sandusky Wellness Ctr., LLC v. Medtox Scientific, Inc., 821 F.3d 992, 995

(8th Cir. 2016)); see Cherry v. Dometic Corp., 986 F.3d 1296, 1302 (11th Cir. 2021).  Most

29

courts agree "that ascertainability means that a class definition must render potential class members identifiable according to objective criteria." McCormick, 422 F. Supp. 3d at 241; see also, e.g., Mullins v. Direct Digital, LLC, 795 F.3d 654, 657 (7th Cir. 2015) ("[A] class must be defined clearly and . . . by objective criteria rather than by, for example, a class member's state of mind."); In re Petrobras Sec., 862 F.3d 250, 257 (2d Cir. 2017) (class should be "defined using objective criteria that establish a membership with definite boundaries").  Some courts apply a "heightened" standard for ascertainability, requiring proof of both the definition of a class and its administrative feasibility—i.e., that identification of the class members will be manageable.  See In re McCormick, 422 F. Supp. 3d at 242.  But this heightened standard has been adopted by a minority of circuits and has not been endorsed by the D.C. Circuit.  Id. at 241–42 (noting the absence of controlling D.C. Circuit precedent and adopting reasoning of courts that have rejected the heightened ascertainability requirement); Cherry, 986 F.3d at 1302 (explaining that the Third, First, and Fourth Circuits require proof of administrative feasibility, while the Second, Sixth, Seventh, Eighth, and Ninth do not).

The Court takes no position on whether Rule 23(a) requires class members' identities to be "ascertainable" before a class is certified, given that the D.C. Circuit has not addressed the question.  Azar, 925 F.3d at 1320.  If such a requirement exists, however, the Court finds it has been satisfied here.  The proposed class "can be ascertained by objective criteria," McCormick, 422 F. Supp. 3d at 241 (quoting 1 Newberg & Rubenstein on Class Actions § 3:3 (6th ed.)), namely, that the class members' claims (1) arise from injuries or deaths that were caused by EFP attacks in Iraq between 2005 and 2011, and (2) that at the time of the attacks, the class members were U.S. servicemembers, contractors, American citizens, or their immediate family.  Class Cert. Mot. at 20.  The method of identifying whether someone is in the class is also

"administratively feasible."  Id. (quoting Carrera v. Bayer Corp., 727 F.3d 300, 307 (3d Cir.

2013)).  Using available government data, Plaintiffs have already identified each EFP attack that

occurred in Iraq between 2005 and 2011, and they can identify which U.S. servicemembers or

civilians were killed or injured in any given attack.  PX-44 (CENTCOMM Data); see PX-36

(McDonnell Decl.) ¶¶ 16–17, 19 (noting that records, such as medical treatment reports, autopsy

reports, and U.S. Army AR 15-6 investigation reports, can aid in the identifying of class

members); PX-37 (Mallak Decl.) ¶¶ 3, 19-21 (explaining that the Armed Forces Medical

Examiner System ("AFMES") database of cases could be used "to identify the hundreds of

armed forces and civilian casualties of EFP attacks," due to the unique characteristics of EFP

wounds).  Additionally, available military records—many of which Plaintiffs have already

obtained in discovery—make it possible to identify the next of kin of class members who were

killed in EFP attacks.  See PX-46 (Perles Decl.); PX-50 (Bonner Decl.) (describing time spent by

class counsels identifying class members through open source research and class discovery); PX-

39 (Lorraine Decl.) (noting that veterans' networks serving all 50 states have the resources to

contact veterans harmed by EFP attacks and their families).

The Court therefore concludes that Plaintiffs have met Rule 23(a)'s prerequisites to class

certification.

    2.  *Rule 23(b)(3)*

Finally, Plaintiffs seek certification under Rule 23(b)(3) because, in their view,

"questions of law or fact common to class members predominate over any questions affecting

only individual members" and "a class action is superior to other available methods for fairly and

efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  The Court addresses each of

these requirements in turn.

a.    Predominance

To demonstrate that common issues predominate over individualized ones, a plaintiff need not "prove that each 'element of his claim is susceptible to classwide proof.'" Howard, 322 F.R.D. at 136 (quoting Amgen, 568 U.S. at 469). Rather, "[p]laintiffs must establish that the common issues in this case predominate over any non-common issues, bearing in mind that 'common issues need only be predominant, not dispositive of the litigation.'" Trombley v. Nat'l City Bank, 826 F. Supp. 2d 179, 193-94 (D.D.C. 2011) (quoting Cohen v. Chilcott, 522 F. Supp. 2d 105, 116 (D.D.C. 2007)).

Here, Plaintiffs' argument that common issues predominate has some appeal. As described above, the evidence linking Iran to the production of EFPs and their distribution to various militia groups in Iraq is common to all class members. Using this common evidence, Plaintiffs could establish for the entire class that any death or injury caused by an EFP attack can serve as the basis for a claim under the FSIA. And because the evidence shows that Iran provided material support for all EFP attacks that caused fatalities in Iraq, there are no individualized determinations to be made with respect to Iran's responsibility for building EFPs, Iran's distribution of EFPs to militias in Iraq, and Iran's instructions about how to deploy EFPs effectively.

At the same time, the Court harbors some concerns about the number and significance of individualized determinations that will remain after Plaintiffs have established Iran's responsibility for all EFP attacks in Iraq. The main issue that will require individualized consideration, of course, is the amount of damages distributed to each class member, and as for that issue, the Court recognizes that "the mere existence of individualized damages in a Rule 23(b)(3) class does not cause individual issues to predominate over common issues on liability or

32

causation." Johnson v. District of Columbia, 248 F.R.D. 46, 57 (D.D.C. 2008).  "There are many ways of dealing with possible individual damages issues, if necessary, such as '(1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class.'"  Id. (quoting Carnegie v. Household Int'l, Inc., 376 F.3d 656, 661 (7th Cir. 2004)).

But damages are not the only individualized determinations that would remain after the common fact of Iran's involvement is established.  For instance, for class members to be entitled to recover, they will need to show that they (or their deceased family member) were present at the date, time, and location that an EFP was employed.  They will also presumably need to show that their injuries (or those of their deceased family member) were actually caused by an EFP. The named Plaintiffs have made this showing through evidence and expert declarations that required the examination of a substantial volume of records, including examinations of autopsy reports and photographs showing the presence of copper shrapnel characteristic of EFP attacks, medical records, death certificates, AR 15-6 incident reports, SIGACT reports, and other materials.  Pls.' Mot. on Liability at 21–25.  To make that showing on a classwide basis could not be done with a single source of common proof or database; it would presumably require the review of all the same types of evidence that established an EFP caused the injuries to the named Plaintiffs.  In light of the substantial and varied evidence that would be required to assess injuries and damages for each class member, the Court struggles to see how class treatment in this case would be meaningfully different from individual trials or multi-plaintiff cases that have used

bellwether attacks to address liability and damages arising from EFP incidents.  See, e.g.,

Karcher, 396 F. Supp. at 14; Lee, 518 F. Supp. 3d at 483.

Accordingly, the Court is not convinced that common issues predominate over

individualized ones in this case.

b.  Superiority

The Court has similar doubts when it comes to superiority.

The superiority requirement in Rule 23(b)(3) depends upon whether resolution of the case

through a class action will "achieve economies of time, effort, and expense, and promote

uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or

bringing about other undesirable results."  McKinney v. U.S. Postal Serv., 292 F.R.D. 62, 65

(D.D.C. 2013) (quoting Hardy v. District of Columbia, 283 F.R.D. 20, 26–27 (D.D.C. 2012)).

There are four factors courts should consider when assessing superiority: (a) class members'

interests in individually controlling separate actions; (b) the extent and nature of any litigation

concerning the controversy already commenced; (c) the desirability of concentrating the

litigation of the claims in one forum; and (d) the likely difficulties in managing a class action.

Id.; see also Fed. R. Civ. P. 23(b)(3)(A)–(D).

First, regarding class members' interests in pursuing individual actions, this class action

is out of the ordinary for Rule 23(b)(3) class actions, for a few reasons.  For one, at least on

paper, the damages awards against Iran for terrorist attacks against military personnel have been

quite large, ranging anywhere from hundreds of thousands to millions of dollars per person.

Mot. for Class Certification at 34–35, ECF No. 60.  The "'most compelling rationale' for class

certification—a negative value suit—is" therefore missing in this case.  Meijer, Inc. v. Warner

Chilcott Holdings Co., 246 F.R.D. 293, 313 (D.D.C. 2007) (citation omitted).  What's more, a

34

number of plaintiffs have already come forth and filed their own actions stemming from Iran's support of EFP (and other) attacks in Iraq, showing that large, multi-party actions are not impossibly burdensome in this case. See, e.g., Karcher, 396 F. Supp. 3d at 14 (case concerning 92 attacks on U.S. servicemembers and others in Iraq, mostly involving EFPs); Lee, 518 F. Supp. 3d at 479 (case concerning 99 attacks, many involving EFPs); Plaintiffs' Second Amended Complaint, Estate of Fishbeck v. Islamic Republic of Iran, No. 18-cv-2248-CRC (D.D.C. Sept. 6, 2022), ECF No. 100 (case concerning multiple Iranian-backed EFP attacks). These facts weigh against finding superiority.

Plaintiffs might respond that this case is different. For one, the large monetary judgments awarded in other cases are not in reality what they appear to be on paper. "Given the difficulty in executing a judgment against a state sponsor of terrorism, most plaintiffs who recover under § 1605A receive compensation, if at all, on a pro rata basis from a fund created by Congress." Force, 2022 WL 2452606, at *6. Because that fund mainly consists of proceeds from penalties paid by companies and persons who violate sanctions imposed on state sponsors of terrorism, "claimants typically receive only pennies on the dollar from each, periodic distribution." Id. Class treatment might also provide counsel with additional incentives to expend the financial and other resources necessary to collect eligible Iranian assets and enforce a judgment. See PX-46 (Perles Decl.) ¶ 9. But even though recoveries are smaller than they may at first appear, there is significant potential for large individual damages awards. See Force, 2022 WL 2452606, at *6. ("claimant received $105,000 of a $2.5 million compensatory judgment in 2019, another $146,000 in 2020, and nothing in 2021" (quoting Braun v. United States, 31 F.4th 793, 795 (D.C. Cir. 2022)). And counsel in this case and other individual-plaintiff cases appear highly motivated to secure and enforce judgments.

Second, with respect to the extent and nature of any litigation concerning the controversy already commenced, Plaintiffs maintain that the passage of time since the relevant attacks favors protecting class interests in pursuing claims against Iran.  Mot. for Class Certification at 39, ECF No. 60.  Plaintiffs also assert that their exclusion of litigants in other actions from the class here should allay any concerns about the extent and nature of litigation already pending.  Id.  But the fact that Plaintiffs have carved out existing litigation from the class does not change the fact that the number of pending individual actions is itself evidence that class members have both the motivation and the means to pursue claims on their own, which weighs against superiority.  2 Newberg & Rubenstein on Class Actions § 4:70 (6th ed.).  To be sure, class treatment could help alert class members unaware of Iran's role in supporting the use of EFPs that they are entitled to a recovery against Iran.  See PX-41 (T. Tiffner Decl.) ¶ 3; PX-42 (Hochstetler Decl.) ¶ 5.  But the number of litigants who have already sought to hold Iran accountable for EFP attacks suggests that many potential class members are quite aware of these facts and that they have a real potential interest in controlling their own, separate actions.  This factor, like the first, tips against finding superiority.

Regarding the third factor, however, the concentration of FSIA claims against Iran in this forum does not pose a problem.  The FSIA specifically identifies this district as the appropriate catch-all venue for suits against foreign states under the statute.  28 U.S.C. § 1391(f)(4).  So litigation of this sort, particularly litigation against Iran for its use of EFPs in Iraq, is already concentrated overwhelmingly in this district.  Additionally, because the issue of Iran's liability for EFP attacks is common to all class members, judicial efficiency favors resolving at least that aspect of this case though a single proceeding.  See McKinney, 292 F.R.D. at 66 ("Resolving this uniform legal issue through a single, cohesive proceeding is far superior to requiring the

potential class members to initiate a multiplicity of individual actions."). And although individualized damages determinations would be necessary, courts in this district have addressed damages quickly and efficiently with the assistance of magistrate judges or special masters. See, e.g., Estate of Doe v. Islamic Republic of Iran, 808 F. Supp. 2d 1, 5–6, 23–24 (D.D.C. 2011) (entering liability judgment against Iran on behalf of 59 plaintiffs pursuing claims under the FSIA in action related to the Iranian-sponsored bombings of the U.S. Embassy in Beirut and referring damages determinations to a Magistrate Judge). Concentrating the litigation in this district, where it is already concentrated, would serve judicial economy.

Finally, the concerns raised above regarding individualized proof also suggest that managing the class might be difficult, or at least no less difficult than bringing individual or multi-plaintiff actions. Plaintiffs note that similar past cases provide a blueprint that the Court can follow, including with the assistance of magistrate judges or special masters. See Peterson v. Islamic Republic of Iran, 515 F. Supp. 2d 25, 37, 51–66 (D.D.C. 2007) (special master appointed to make initial assessments regarding the damages of hundreds of plaintiffs who were victims of the 1983 Beirut Marine Barracks bombing); Heiser v. Islamic Republic of Iran, 466 F. Supp. 2d 229, 248–50 (D.D.C. 2006) (case referred to magistrate judge for proposed findings and recommendations regarding judgement by default against Iran). But these cases were not class actions, and the fact that the courts there effectively used special masters and magistrates to conduct the same inquiries at issue here again suggests that the benefits of class treatment, when weighed against individuals' interests in bringing their own claims, are slim.

*    *    *

The Court does not here conclude that class treatment is absolutely inappropriate in this case. But for the reasons just explained, the Court remains unconvinced about the relative

37

benefits of class certification.  Because Plaintiffs may be able to allay the Court's concerns, the Court will deny the motion for class certification without prejudice to renewal after a hearing on the matter.[5]

The Court also reserves judgment on whether some form of issue certification under Rule 23(c)(4) may be an adequate, or useful, alternative to full class certification.  See, e.g., Mejdrech v. Met-Coil Sys. Corp., 31 F.3d 910, 910–12 (7th Cir. 2003) (affirming issue certification as to the "core questions" whether the defendant caused groundwater contamination in a given area while reserving for individual hearings whether "a particular class member suffered any legally compensable harm and if so in what dollar amount"); but see id. at 912 (cautioning that "[w]hen enormous consequences turn on the correct resolution of a complex factual question, the risk of error in having it decided once and for all by one trier of fact rather than letting a consensus emerge from several trials may be undue").  In particular, the Court notes that the D.C. Circuit has not weighed in on exactly how to apply the predominance and superiority requirements of Rule 23(b)(3) when certifying discrete issues under Rule 23(c)(4).  See Harris v. Med. Transp. Mgmt., Inc., No. 17-cv-01371 (APM), 2021 WL 3472381, at *8 (D.D.C. Aug. 6, 2021) (noting the absence of Supreme Court or D.C. Circuit authority on how to apply the 23(b)(3) requirements to issue certification, as well as split authorities within this district).  Although issue certification may be appropriate, the Court is not convinced that the question has been sufficiently ventilated at this stage of this litigation to come to a conclusion.

## D.  Liability

As noted above, there is "almost total 'overlap between the elements of § 1605A(c)'s cause of action and the terrorism exception to foreign sovereign immunity.'"  Lee, 518 F. Supp.

---

[5] The Court will coordinate with the parties to schedule a hearing expeditiously.

38

3d at 495–96 (quoting <u>Salzman</u>, 2019 WL 4673761, at \*15).  Therefore, "a plaintiff that offers proof sufficient to establish a waiver of sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of law."  <u>Id.</u>; <u>see also</u> <u>Karcher</u>, 396 F. Supp. 3d at 59 ("Given the overlap between the elements of this cause of action and the terrorism exception, Iran's liability has already been established . . . by the conclusions of law set forth above."); <u>Allan v. Islamic Republic of Iran</u>, Civil Case No. 17-338 (RJL), 2019 WL 2185037, at \*6 (D.D.C. May 21, 2019) ("[M]ost courts conduct the analysis together, since evidence sufficient to establish jurisdictional causation will almost always establish a theory of 'personal injury' necessary to prevail under § 1605A(c).").

However, because  Rule 23(a) and Rule 23(b)(3) require that the named plaintiffs maintain the incentive to prove facts common to all class members' claims, and because the Court has not yet definitively decided whether some form of class treatment may be appropriate in this case, the Court will deny without prejudice Plaintiffs' request for entry of a default judgment until after the Court has settled the class certification issue and, if appropriate, a class notice and opt-out period has expired.  Whatever the Court's ultimate conclusion as to class certification, Plaintiffs will be permitted to file a renewed motion for default judgment as to liability.

**IV.    Conclusion**

Accordingly, it is hereby

**ORDERED** that [60] Plaintiffs' Motion to Certify a Class is DENIED without prejudice.

It is further

**ORDERED** that [58] Plaintiffs' Motion for Default Judgment as to Liability is DENIED

without prejudice.

**SO ORDERED**.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  September 30, 2022

40